1  SHARON D. MAYO (State Bar No. 150469)
   sharon.mayo@aporter.com
2  ARNOLD & PORTER LLP
   One Embarcadero Center, 22nd Floor
3  San Francisco, California  94111
   Telephone:  415-356-3000
4  Facsimile:  415-356-3099

5  Of Counsel:

6
   JEFFREY L. HANDWERKER
7  jeffrey.handwerker@aporter.com
   ARNOLD & PORTER LLP
8  555 Twelfth St., N.W.
   Washington, D.C.  20004
9  Telephone:  202-942-5000
   Facsimile:  202-942-5999
10

11
   Attorneys for Defendant
12 Bristol-Myers Squibb Company

13

14            UNITED STATES DISTRICT COURT

15            CENTRAL DISTRICT OF CALIFORNIA

16                 WESTERN DIVISION

17 AIDS HEALTHCARE              )  Case No. CV-10-9126 GW (FMCx)
   FOUNDATION,                  )
18                              )  **STIPULATION FOR DISMISSAL
                                )  OF ACTION WITHOUT
19            Plaintiff,        )  PREJUDICE**
                                )
20      v.                      )
                                )  **[PROPOSED ORDER FILED
21 BRISTOL-MYERS SQUIBB         )  CONCURRENTLY HEREWITH]**
   COMPANY, and DOES 1 – 10,    )
22                              )
                                )
23            Defendants.       )
                                )
24 _____)

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IT IS HEREBY STIPULATED by and between Plaintiff AIDS Healthcare Foundation ("Plaintiff") and Defendant Bristol-Myers Squibb Company ("Defendant"), through their respective counsel, that, pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii), and in light of the United States Supreme Court's decision in *Astra USA, Inc. v. Santa Clara County*, No. 09-1273 (Mar. 29, 2011) (attached), the above-captioned action shall be dismissed in its entirety without prejudice, with each party to bear its own costs and attorneys' fees.

Dated: April 6, 2011

ARNOLD & PORTER LLP

By: _____
    Sharon D. Mayo

    Attorneys for Defendant Bristol-Myers Squibb Company

Dated: April 5, 2011

AIDS HEALTHCARE FOUNDATION

By: _____
    Tom Myers

    Attorneys for Plaintiff AIDS Healthcare Foundation

- 1 -

1

**CERTIFICATE OF SERVICE**

2       I hereby certify that on April ____, 2011, I electronically filed the foregoing

3 with the Clerk of the Court using the CM/ECF system which will send notification of

4 such filing to the e-mail addresses denoted on the attached Electronic Mail Notice

5 List, and I hereby certify that I have mailed the foregoing document or paper via the

6 United States Postal Service to the non-CM/ECF participants indicated on the

7 attached Manual Notice List.

8       I certify under penalty of perjury under the laws of the United States of

9 America that the foregoing is true and correct.  Executed on April ____, 2011.

10

11

12       Sharon D. Mayo

13       ARNOLD & PORTER LLP
      One Embarcadero Center, 22nd Floor

14       San Francisco, CA 94111
      Telephone:  (415) 356-3000

15       Facsimile:  (415) 356-3099
      E-mail:  sharon.mayo@aporter.com

16

17

18

19

20

21

22

23

24

25

26

27

28

- 2 -

**Mailing Information for a Case 2:10-cv-09126-GW -FMO**

## I.   Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Fred Brian Chase**
  brian.chase@aidshealth.org
- **Thomas Andrew Myers**
  tom.myers@aidshealth.org

## II.   Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)

(Slip Opinion)          OCTOBER TERM, 2010                    1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States v. Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## ASTRA USA, INC., ET AL. *v.* SANTA CLARA COUNTY, CALIFORNIA

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR
THE NINTH CIRCUIT

No. 09–1273.   Argued January 19, 2011—Decided March 29, 2011

Section 340B of the Public Health Services Act imposes ceilings on
prices drug manufacturers may charge for medications sold to speci-
fied health care facilities (340B or covered entities), dominantly, local
providers of medical care for the poor.  The §340B ceiling-price pro-
gram (340B Program) is superintended by the Health Resources and
Services Administration (HRSA), part of the Department of Health
and Human Services (HHS).  It is tied to the earlier-enacted, much
larger Medicaid Drug Rebate Program, under which manufacturers
gain Medicaid coverage for their drugs.  To qualify for participation
in this program, a manufacturer must enter into a standardized
agreement with HHS undertaking to provide rebates to States on
their Medicaid drug purchases.  The amount of the rebates depends
on a manufacturer's "average" and "best" prices, as defined by legisla-
tion and regulation.  The 340B Program, like the Medicaid Rebate
Program, uses a form contract as an opt-in mechanism.  The 340B
Program also draws on the larger scheme's pricing methodology.  In
the 340B Program's contract, called the Pharmaceutical Pricing
Agreement (PPA), manufacturers agree to charge covered entities no
more than predetermined ceiling prices, derived from the "average"
and "best" prices and rebates calculated under the Medicaid Rebate
Program.

  HRSA may require a manufacturer who overcharges a covered en-
tity to reimburse that entity.  HRSA may also terminate the manu-
facturer's PPA, which terminates as well the manufacturer's eligibil-
ity for Medicaid coverage of its drugs.  Currently, HRSA handles
overcharge complaints through informal procedures, but the 2010 Pa-
tient Protection and Affordable Care Act (PPACA) directs the Secre-

2          ASTRA USA, INC. *v.* SANTA CLARA COUNTY

Syllabus

tary to develop formal procedures. Once those procedures are in
place, HRSA will reach an "administrative resolution," which will be
subject to judicial review under the Administrative Procedure Act
(APA). In addition to authorizing compensation awards to over-
charged entities, the PPACA provides for the imposition of monetary
penalties payable to the Government.

Respondent Santa Clara County (County), operator of several 340B
entities, filed suit against Astra and eight other pharmaceutical com-
panies, alleging that they were overcharging 340B entities in viola-
tion of the PPAs. Asserting that 340B entities are the PPAs' in-
tended beneficiaries, the County sought compensatory damages for
breach of contract. The District Court dismissed the complaint, con-
cluding that the PPAs conferred no enforceable rights on 340B enti-
ties. Reversing, the Ninth Circuit held that, while 340B entities have
no right to sue under the statute, they could proceed against drug
manufacturers as third-party beneficiaries of the PPAs.

*Held:* Suits by 340B entities to enforce ceiling-price contracts running
between drug manufacturers and the Secretary of HHS are incom-
patible with the statutory regime. As the County has conceded, cov-
ered entities have no right of action under §340B itself. Congress
vested authority to oversee compliance with the 340B Program in
HHS and assigned no auxiliary enforcement role to covered entities.
Nonetheless, the County maintains that the PPAs are contracts en-
forceable by covered entities as third-party beneficiaries. This argu-
ment overlooks that the PPAs simply incorporate statutory obliga-
tions and record the manufacturers' agreement to abide by them.
The agreements have no negotiable terms. Like the Medicaid Rebate
Program agreements, the PPAs provide the means by which drug
manufacturers opt into the statutory scheme. A third-party suit to
enforce an HHS-drug manufacturer agreement, therefore, is in es-
sence a suit to enforce the statute itself. Telling in this regard, the
County based its suit on allegations that the manufacturers charged
more than the §340B ceiling price, not that they violated an inde-
pendent substantive obligation arising from the PPAs.

The Ninth Circuit reasoned that suits like the County's would
spread the enforcement burden instead of placing it entirely on the
Government. But spreading the enforcement burden is hardly what
Congress contemplated when it made HHS administrator of the in-
terdependent Medicaid Rebate Program and 340B Program. Suits by
340B entities would undermine the agency's efforts to administer
these two programs harmoniously and uniformly. Notably, the Medi-
caid Rebate Program's statute prohibits HHS from disclosing pricing
information that could reveal the prices a manufacturer charges for
its drugs. Had Congress meant to leave open the prospect of third-

Cite as:  563 U. S. ____ (2011)   3

Syllabus

party beneficiary suits by 340B entities, it likely would not have barred them from obtaining the very information necessary to determine whether their asserted rights have been violated.

The Ninth Circuit noted that HHS's Office of the Inspector General has reported on HRSA's inadequate enforcement authority.   But Congress did not respond to the reports of lax enforcement by inviting 340B entities to launch lawsuits.   Instead, Congress opted to strengthen and formalize HRSA's enforcement authority, to make the new adjudicative framework the proper remedy for covered entities' complaints, and to render the agency's resolution of those complaints binding, subject to judicial review under the APA.  Pp. 5–10.

588 F. 3d 1237, reversed.

GINSBURG, J., delivered the opinion of the Court, in which all other Members joined, except KAGAN, J., who took no part in the consideration or decision of the case.

Cite as: 563 U. S. ____ (2011)                    1

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports.  Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

———

No. 09–1273

———

## ASTRA USA, INC., ET AL., PETITIONERS v. SANTA CLARA COUNTY, CALIFORNIA

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[March 29, 2011]

JUSTICE GINSBURG delivered the opinion of the Court.

Section 340B of the Public Health Services Act, 42 U. S. C. A. §256b (Oct. 2010 Supp.), imposes ceilings on prices drug manufacturers may charge for medications sold to specified health care facilities.  Those facilities, here called "340B" or "covered" entities, include public hospitals and community health centers, many of them providers of safety-net services to the poor.  The §340B ceiling-price program (340B Program) is superintended by the Health Resources and Services Administration (HRSA), a unit of the Department of Health and Human Services (HHS).  Drug manufacturers opt into the 340B Program by signing a form Pharmaceutical Pricing Agreement (PPA) used nationwide.  PPAs are not transactional, bargained-for contracts.  They are uniform agreements that recite the responsibilities §340B imposes, respectively, on drug manufacturers and the Secretary of HHS.  Manufacturers' eligibility to participate in state Medicaid programs is conditioned on their entry into PPAs for covered drugs purchased by 340B entities.

It is conceded that Congress authorized no private right

2          ASTRA USA, INC. *v.* SANTA CLARA COUNTY

Opinion of the Court

of action under §340B for covered entities who claim they
have been charged prices exceeding the statutory ceiling.
This case presents the question whether 340B entities,
though accorded no right to sue for overcharges under the
statute itself, may nonetheless sue allegedly overcharging
manufacturers as third-party beneficiaries of the PPAs to
which the manufacturers subscribed.  We hold that suits
by 340B entities to enforce ceiling-price contracts running
between drug manufacturers and the Secretary of HHS
are incompatible with the statutory regime.

Congress placed the Secretary (acting through her
designate, HRSA) in control of §340B's drug-price pre-
scriptions.   That control could not be maintained were
potentially thousands of covered entities permitted to
bring suits alleging errors in manufacturers' price calcula-
tions.  If 340B entities may not sue under the statute, it
would make scant sense to allow them to sue on a form
contract implementing the statute, setting out terms
identical to those contained in the statute.  Though labeled
differently, suits to enforce §340B and suits to enforce
PPAs are in substance one and the same.   Their treat-
ment, therefore, must be the same, "[n]o matter the cloth-
ing in which [340B entities] dress their claims."  *Tenet* v.
*Doe*, 544 U. S. 1, 8 (2005).

I
A

The 340B Program is tied to the earlier-enacted, much
larger Medicaid Drug Rebate Program.  Adopted by Con-
gress in 1990, the Medicaid Rebate Program covers a
significant portion of drug purchases in the United States.
See GAO, J. Dicken, Prescription Drugs: Oversight of
Drug Pricing in Federal Programs 1 (GAO–07–481T, 2007)
(testimony before the Committee on Oversight and Gov-

Opinion of the Court

ernment Reform, House of Representatives).[1]   To gain payment under Medicaid for covered drugs, a manufacturer must enter a standardized agreement with HHS; in the agreement, the manufacturer undertakes to provide rebates to States on their Medicaid drug purchases.  104 Stat. 1388–143, as amended, 124 Stat. 3290, 42 U. S. C. A. §1396r–8(a).  The amount of the rebates depends on the manufacturer's "average" and "best" prices, as defined by legislation and regulation. §1396r–8(c), (k).

Calculation of a manufacturer's "average" and "best" prices, undertaken by the pharmaceutical company, is a complex enterprise requiring recourse to detailed information about the company's sales and pricing.  §1396r–8(k); 42 CFR §447.500–520 (2010).  To enable HHS to calculate the rebate rate for each drug, manufacturers submit the relevant data to HHS on a quarterly basis.  §1396r–8(b)(3).  With exceptions set out in the legislation, HHS is prohibited from disclosing the submitted information "in a form which discloses the identity of a specific manufacturer . . . [or] prices charged for drugs by such manufacturer." §1396r–8(b)(3)(D).

Under §340B, added in 1992, 106 Stat. 4967, as amended, 124 Stat. 823, manufacturers participating in Medicaid must offer discounted drugs to covered entities, dominantly, local facilities that provide medical care for the poor.  See §256b(a); §1396r–8(a)(1).  The 340B Program, like the Medicaid Drug Rebate Program, employs a form contract as an opt-in mechanism.  The 340B Program also draws on the larger scheme's pricing methodology.  In their 340B Program contracts with HHS, called Pharma-

---

[1] "In 2004, Medicaid . . . prescription drug spending reached $31 billion," GAO, J. Dicken, Prescription Drugs: Oversight of Drug Pricing in Federal Programs 4 (GAO–07–481T, 2007) (testimony before the Committee on Oversight and Government Reform, House of Representatives), while in 2003, 340B entities "spent an estimated $3.4 billion on drugs," *id.*, at 5.

ceutical Pricing Agreements (PPAs), see *supra*, at 1, manufacturers agree to charge covered entities no more than predetermined ceiling prices, derived from the "average" and "best" prices and rebates calculated under the Medicaid Drug Rebate Program. §256b(a)(1); see App. to Pet. for Cert. 165a–171a (PPA §I–II).[2]

If a manufacturer overcharges a covered entity, HRSA may require the manufacturer to reimburse the covered entity; HRSA may also terminate the manufacturer's PPA, §1396r–8(b)(4)(B)(i), (v); App. to Pet. for Cert. 174a (PPA §IV(c)), which terminates as well the manufacturer's eligibility for Medicaid coverage of its drugs, §1396r–8(a)(1), (5). Currently, HRSA handles overcharge complaints through informal procedures. Manufacturer Audit Guidelines and Dispute Resolution Process, 61 Fed. Reg. 65412 (1996). The 2010 Patient Protection and Affordable Care Act (PPACA), Pub. L. 111–148, 124 Stat. 119, provides for more rigorous enforcement. The PPACA directs the Secretary to develop formal procedures for resolving overcharge claims. *Id.*, at 826, 42 U. S. C. A. §256b(d)(3)(A). Under those procedures, which are not yet in place, HRSA will reach an "administrative resolution" that is subject to judicial review under the Administrative Procedure Act (APA), 5 U. S. C. §701 *et seq.* See 124 Stat. 827, 42 U. S. C. A. §256b(d)(3)(C). In addition to authorizing compensation awards to overcharged entities, the PPACA provides for the imposition of monetary penalties payable to the Government. *Id.*, at 824–825, 42 U. S. C. A. §256b(d)(1)(B)(ii), (vi).

### B

Respondent Santa Clara County (County), operator of

---

[2]The 340B Program also covers over-the-counter medications for which there are no Medicaid rebates. 42 U. S. C. A. §256b(a)(2)(B) (Oct. 2010 Supp.). For such drugs, §340B prescribes a substitute calculation method. §256b(a)(2)(B)(i).

Opinion of the Court

several 340B entities, commenced suit against Astra and eight other pharmaceutical companies, alleging that the companies were overcharging 340B health care facilities in violation of the PPAs to which the companies subscribed. The County styled its suit a class action on behalf of both 340B entities in California and the counties that fund those entities. Asserting that the 340B entities and the counties that fund them are the intended beneficiaries of the PPAs, the County sought compensatory damages for the pharmaceutical companies' breach of contract.

The District Court dismissed the complaint, concluding that the PPAs conferred no enforceable rights on 340B entities. Reversing the District Court's judgment, the Ninth Circuit held that covered entities, although they have no right to sue under the statute, could maintain the action as third-party beneficiaries of the PPAs. 588 F. 3d 1237, 1241 (2009).

We granted certiorari, 561 U. S. ____ (2010),[3] and now reverse the Ninth Circuit's judgment.

II

As the County conceded below and before this Court, see 588 F. 3d, at 1249; Tr. of Oral Arg. 45, covered entities have no right of action under §340B itself. "[R]ecognition of any private right of action for violating a federal statute," currently governing decisions instruct, "must ultimately rest on congressional intent to provide a private remedy." *Virginia Bankshares, Inc.* v. *Sandberg*, 501 U. S.

———————

[3] U. S. Courts of Appeals have divided on the circumstances under which suits may be brought by alleged third-party beneficiaries of Government contracts. Compare 588 F. 3d 1237, 1244 (CA9 2009) (case below) ("Any intended beneficiary has the right to enforce the obligor's duty of performance . . . ."), with *Grochowski* v. *Phoenix Construction*, 318 F. 3d 80, 85–86 (CA2 2003) ("there is no presumption in favor of a right to bring suit" as third-party beneficiary of a government contract), and *Dewakuku* v. *Martinez*, 271 F. 3d 1031, 1042 (CA Fed. 2001) (rejecting third-party suit).

6          ASTRA USA, INC. *v.* SANTA CLARA COUNTY

Opinion of the Court

1083, 1102 (1991).  See also *Stoneridge Investment Part-
ners, LLC* v. *Scientific-Atlanta, Inc.*, 552 U. S. 148, 164
(2008); *Alexander* v. *Sandoval*, 532 U. S. 275, 286 (2001).
Congress vested authority to oversee compliance with the
340B Program in HHS and assigned no auxiliary enforce-
ment role to covered entities.

Notwithstanding its inability to assert a statutory right
of action, the County maintains that the PPAs implement-
ing the 340B Program are agreements enforceable by
covered entities as third-party beneficiaries.  A nonparty
becomes legally entitled to a benefit promised in a
contract, the County recognizes, only if the contracting
parties so intend.  Brief for Respondent 31 (citing Re-
statement (Second) of Contracts §302(1)(b) (1979)).  The
PPAs "specifically nam[e]" covered entities as the recipi-
ents of discounted drugs, the County observes; indeed the
very object of the agreements is to ensure that those enti-
ties would be "charge[d] . . . no more than the ceiling
price."  Brief for Respondent 33.  When the Government
uses a contract to secure a benefit, the County urges, the
intended recipient acquires a right to the benefit enforce-
able under federal common law.  *Id.*, at 30.  But see 9 J.
Murray, Corbin on Contracts §45.6, p. 92 (rev. ed. 2007)
("The distinction between an intention to benefit a third
party and an intention that the third party should have
the right to enforce that intention is emphasized where
the promisee is a governmental entity.").

The County's argument overlooks that the PPAs simply
incorporate statutory obligations and record the manufac-
turers' agreement to abide by them.  The form agree-
ments, composed by HHS, contain no negotiable terms.
Like the Medicaid Drug Rebate Program agreements, see
*supra*, at 3, the 340B Program agreements serve as the
means by which drug manufacturers opt into the statutory
scheme.  A third-party suit to enforce an HHS-drug manu-
facturer agreement, therefore, is in essence a suit to en-

Opinion of the Court

force the statute itself.  The absence of a private right to
enforce the statutory ceiling price obligations would be
rendered meaningless if 340B entities could overcome that
obstacle by suing to enforce the contract's ceiling price
obligations instead.  The statutory and contractual obliga-
tions, in short, are one and the same.  See *Grochowski* v.
*Phoenix Construction*, 318 F. 3d 80, 86 (CA2 2003) (when
a government contract confirms a statutory obligation, "a
third-party private contract action [to enforce that obliga-
tion] would be inconsistent with . . . the legislative scheme
. . . to the same extent as would a cause of action directly
under the statute" (internal quotation marks omitted)).

Telling in this regard, the County based its suit on
allegations that the manufacturers charged more than the
§340B ceiling price, see, *e.g.,* Third Amended Complaint in
No. 3:05–cv–03740 (ND Cal.), ¶1, 65, not that they vio-
lated any independent substantive obligation arising only
from the PPAs.[4]  Repeatedly, the County acknowledged
that §340B is the source of the contractual term allegedly
breached.  See, *e.g., id.,* ¶28 ("[Section] 340B requires
pharmaceutical manufacturers to ensure that §340B
Participants pay no more than the 'ceiling price' . . . for
any pharmaceutical product."); *id.,* ¶36 ("Under both
§340B and the PPA, [drug manufacturers] are required to
ensure that the §340B Participants . . . pay no more for
any product than the §340B ceiling price.").

———————

[4]Whether a contracting agency may authorize third-party suits to
enforce a Government contract is not at issue in this case.  Cf. Brief for
United States as *Amicus Curiae* 22.  We can infer no such authorization
where a contract simply incorporates statutorily required terms and
otherwise fails to demonstrate any intent to allow beneficiaries to en-
force those terms.  Permitting such a suit, it is evident, would "allo[w]
third parties to circumvent Congress's decision not to permit private
enforcement of the statute." *Id.,* at 23–24; cf. Brief for United States as
*Amicus Curiae* in No. 09–15216 (CA9), p. 21 ("In drafting and entering
into [PPAs], HHS never imagined that a 340B entity could bring a
third-party beneficiary lawsuit like [the County]'s.").

Opinion of the Court

The Ninth Circuit determined that "[p]ermitting covered
entities to sue as intended beneficiaries of the PPA is . . .
wholly compatible with the Section 340B program's objec-
tives" to ensure "that drug companies comply with their
obligations under the program and provide [the required]
discounts." 588 F. 3d, at 1251.  Suits like the County's,
the Court of Appeals reasoned, would spread the enforce-
ment burden instead of placing it "[entirely] on the gov-
ernment." *Ibid.* (citing *Price* v. *Pierce*, 823 F. 2d 1114,
1121 (CA7 1987)).  But spreading the enforcement burden,
the United States stressed, both in the Ninth Circuit and
in this Court, is hardly what Congress contemplated when
it "centralized enforcement in the government." Brief for
United States as *Amicus Curiae* 32; see Brief for United
States as *Amicus Curiae* in No. 09–15216 (CA9), p. 13
(County's challenge is at odds with Congress' unitary
administrative and enforcement scheme).[5]

Congress made HHS administrator of both the Medicaid
Drug Rebate Program and the 340B Program, the United
States observed, Brief for United States as *Amicus Curiae*
33–34, and "[t]he interdependent nature of the two pro-
grams' requirements means that an adjudication of rights
under one program must proceed with an eye towards any
implications for the other," *id.*, at 34.  Far from assisting
HHS, suits by 340B entities would undermine the agency's
efforts to administer both Medicaid and §340B harmoni-

---

[5]The County notes that in *In re Pharmaceutical Industry Average
Wholesale Price Litigation*, 263 F. Supp. 2d 172 (Mass. 2003), the
United States urged that the statute establishing the Medicaid Drug
Rebate Program, §1396r–8, does not preempt States from maintaining
state-law fraud claims based on fraudulent reporting of "best prices" to
HHS.  Brief for Respondent 22–23.  See Brief for United States as
*Amicus Curiae* in No. 1:01–cv–12257 (D Mass.), pp. 6–9 (observing that
States make their own payments to manufacturers and have long
played a role in identifying and prosecuting Medicaid fraud).  We take
no position on this issue.

ously and on a uniform, nationwide basis.[6]  Recognizing the County's right to proceed in court could spawn a multitude of dispersed and uncoordinated lawsuits by 340B entities.  With HHS unable to hold the control rein, the risk of conflicting adjudications would be substantial.

As earlier noted, see *supra*, at 3, the Medicaid Rebate Program's statute prohibits HHS from disclosing pricing information in a form that could reveal the prices a manufacturer charges for drugs it produces. §1396r–8(b)(3)(D).[7] This ban on disclosure is a further indication of the incompatibility of private suits with the statute Congress enacted.  If Congress meant to leave open the prospect of third-party beneficiary suits by 340B entities, it likely would not have barred the potential suitors from obtaining the very information necessary to determine whether their asserted rights have been violated.[8]

It is true, as the Ninth Circuit observed, that HHS's

---

[6]Because the Ninth Circuit focused on the 340B Program in isolation, it failed to recognize that the interests of States under the Medicaid Drug Rebate Program and covered entities under the 340B Program may conflict.  For example, "average" prices are used both to set the amount manufacturers must pay in Medicaid rebates and to establish §340B ceiling prices. §1396r–8(c); §256b(a)(1).  Typically, the lower the "average" price, the lower a product's price to a 340B entity.  Brief for United States as *Amicus Curiae* in No. 09–15216, p. 31.  But the higher the "average" price, the more a State Medicaid agency typically receives in rebates from the manufacturers.  *Ibid.*  HHS can use its expertise to ascertain and balance the competing interests.  *Id.,* at 31–32.  Courts as first-line decisionmakers are not similarly equipped to deal with the whole picture.

[7]HHS interprets this provision, the United States informs us, as prohibiting the agency from disclosing to covered entities the ceiling prices calculated based on information submitted by the manufacturers.  Brief for United States as *Amicus Curiae* 28.

[8]Going forward, the 2010 Patient Protection and Affordable Care Act, Pub. L. 111–148, 124 Stat. 119, in conjunction with the new administrative adjudication process directed by the Act, will require HHS to give covered entities access to some of the information submitted by manufacturers.  *Id.,* at 826, 42 U. S. C. A. §256b(d)(3)(B)(iii).

10 ASTRA USA, INC. *v.* SANTA CLARA COUNTY

Opinion of the Court

Office of the Inspector General (OIG) has published reports finding that "HRSA lacks the oversight mechanisms and authority to ensure that [covered] entities pay at or below the . . . ceiling price." 588 F. 3d, at 1242 (quoting OIG, D. Levinson, Deficiencies in the Oversight of the 340B Drug Pricing Program ii (OEI–05–02–00072, Oct. 2005)). See also 588 F. 3d, at 1242–1243 (citing OIG, D. Levinson, Review of 340B Prices 11 (OEI–05–02–00073, July 2006) (estimating that covered entities overpaid $3.9 million in June 2005 alone)). But Congress did not respond to the reports of inadequate HRSA enforcement by inviting 340B entities to launch lawsuits in district courts across the country. Instead, in the PPACA, Congress directed HRSA to create a formal dispute resolution procedure, institute refund and civil penalty systems, and perform audits of manufacturers. 124 Stat. 823–827, 42 U. S. C. A. §256b(d). Congress thus opted to strengthen and formalize HRSA's enforcement authority, to make the new adjudicative framework the proper remedy for covered entities complaining of "overcharges and other violations of the discounted pricing requirements," *id.,* at 823, 42 U. S. C. A. §256b(d)(1)(A), and to render the agency's resolution of covered entities' complaints binding, subject to judicial review under the APA, *id.,* at 827, 42 U. S. C. A. §256b(d)(3)(C).

*  *  *

For the reasons stated, the judgment of the U. S. Court of Appeals for the Ninth Circuit is

*Reversed.*

JUSTICE KAGAN took no part in the consideration or decision of this case.